# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# BRYSON CITY DIVISION
# 2:09cr20

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) MEMORANDUM AND |
| Vs. | ) RECOMMENDATION |
| | ) |
| ANDREW TAB KILPATRICK. | ) |
| _____ | ) |

**THIS MATTER** is before the court upon defendant's Motion to Suppress. Having carefully considered defendant's Motion to Suppress, the government's response, conducted an evidentiary hearing, and reviewed the pleadings, the court enters the following findings, conclusions, and Recommendation.

## FINDINGS AND CONCLUSIONS

### I. Nature of the Charge

Defendant is charged in a one count Bill of Indictment with possession of a firearm by a convicted felon, a violation of 18, United States Code, Section 922(g)(1). The Grand Jury charges that on or about February 12, 2009, defendant knowingly possessed a .25 caliber pistol in Cherokee County. Docket Entry #1.

### II. Summary of the Facts Presented at the Hearing

At the evidentiary hearing conducted on August 26, 2009, both the government and the defendant called witnesses and moved exhibits into evidence. All witnesses were sequestered. From such evidence, the court has drawn the following factual

background.

On February 12, 2009, defendant's former or estranged wife Anna Kilpatrick and her boyfriend, Robert Wood, were traveling from Mr. Wood's temporary residence in Concord, North Carolina, to defendant's residence in Cherokee County, North Carolina. The purpose of the visit was to pick up or visit with the children of defendant and Ms. Kilpatrick. This impending visit had allegedly upset defendant, who was purportedly sending threatening text and voice messages to Ms. Kilpatrick as she rode as a passenger with Mr. Wood driving on the morning of February 12, 2009. According to Mr. Wood, Ms. Kilpatrick informed him of the disturbing calls and he then called his probation officer on his own cell phone for legal advice. According to Mr. Wood, his probation officer recommended that he call Cherokee County 911 and report the disturbing calls.

The 911 call from Mr. Wood was received by LaDena Jenkins, a dispatcher with Cherokee County 911, who testified at the hearing. Ms. Jenkins testified that Mr. Wood's 911 call came in at 12:51p.m. In that call, the electronic version of which was introduced into evidence by the defendant, Mr. Wood stated that both he and Ms. Kilpatrick had been receiving threatening calls from defendant, that the sheriff's department had a unit out at his home earlier and that defendant hid from them, and gave the dispatcher the street address of the Kilpatrick residence, 210

Heaton Road. When asked by the dispatcher of his name, address, and phone number, Mr. Wood gave such information. See Defendant's Ex. 2., at Track 1. This call was prioritized by 911 as a non-emergency call, to which a deputy was assigned to call Mr. Wood back on the cell number he had provided. Ms. Jenkins informed Mr. Wood of such procedure. Id.; see also Defendant's Government's Ex. 1, at 1. The dispatch report indicates that such incident was received at 12:51 p.m., placed on hold at 12:53 p.m., that Deputy Danny Joe Milsaps was dispatched[1] at 1:04 p.m., and that he acknowledged such dispatch some three seconds after receiving the dispatch. Gov. Ex. 1, at 2.

Minutes after Deputy Milsaps was dispatched, Mr. Wood placed a second call to 911 and again talked with Ms. Jenkins. Ms. Jenkins states that such call came in at 1:21 p.m., but review of the report submitted revealed that such call may have come in as late as 1:24.[2] In this second 911 call, Mr. Wood informed the dispatcher that Ms. Kilpatrick had just received a voice mail from Josh Kilpatrick (defendant's brother)to the effect that defendant had a gun, he had seen it, defendant had

---

 [1]  While there was no testimony as to what unit number was assigned to Deputy Milsaps, the court has through close scrutiny of the consolidated 911 report deduced that Deputy Milsaps is Unit 418.

 [2]  It also appears from the exhibit that another caller called 911 at about 1:12 p.m. concerning threats to kill the caller and Ms. Kilpatrick.

threatened him with it, and that he (Josh Kilpatrick) had left the house to keep from being shot by his brother. Ms. Jenkins responded that "we will send a deputy out for that ." Defendant's Ex. 2, at Track 2. Ms. Jenkins also testified that when she received additional information, it was her routine and practice to communicate such information to responding officers.

Deputy Milsaps testified that he was dispatched to 210 Heaton Rd. at about 1:15 p.m. and was informed by dispatch that a subject with a gun was threatening to shoot his brother. He arrived at defendant's home within a few minutes. He testified that the home was below the road and that the driveway ran at a steep angle down to the house. After parking his patrol vehicle, Deputy Milsaps approached the home and noticed a empty rocking chair on the porch swaying back and forth as if someone had just gotten up from the chair. He then went up onto the porch and knocked on the door twice before defendant came to the door. Upon defendant opening the door, Deputy Milsaps told defendant why he was there and asked defendant to come outside to talk. He testified that defendant fully complied with all such requests. Deputy Milsaps testified that he intentionally moved the conversation away from the house and closer to his patrol car because he did not know whether there was someone else in the home and that he "didn't know who had a gun'" at that point.

Deputy Milsaps testified that as he was talking to defendant at the patrol car,

4

a second officer, Deputy Edward Mathis, arrived.[3] Deputy Milsaps stayed with defendant as Deputy Mathis advanced toward the woods surrounding the house. Deputy Milsaps testified that Deputy Mathis came back after talking with another male, and the two of them then patted down the defendant, finding a pistol in defendant's left front pocket. After discovery of the firearm on defendant's person, defendant was then placed under arrest as Deputy Mathis advised he knew defendant was a convicted felon.[4]

---

[3] Scrutiny of the records placed into evidence would indicate that Deputy Mathis is unit number 415 and that he arrived some three minutes after Deputy Milsaps. Gov. Ex. 1, at 2.

[4] While not relevant to suppression, such witness was asked on cross if he had asked defendant on or about August 12, 2009 (approximately one and one-half months after defendant's initial appearance) why he had not gotten rid of the gun before answering the door the second time the officer came out that day. The deputy admitted that he asked such a question during a transport of defendant to the dentist, but answered that he did not recall that such question included "the second time that day." The court made a point of clarifying the question as to the date of this occurrence inasmuch as the question and the witness's answer suggests that the arresting officer questioned defendant concerning the subject matter of these charges after an initial appearance in this court, invocation of his right to counsel, and without counsel being present. Perhaps the court simply misheard the question as well as the answer, but review of the FTR recording for 08/26/2009 at @ 10:30 a.m. leaves little doubt. The court assumes that this was simply idle banter between an officer acting in his capacity as jailer and defendant, and was not intended to elicit incriminating statements in this matter as such would be wholly inadmissible. Massiah v. United States, 377 U.S. 201 (1964); Michigan v. Jackson, 475 U.S. 625 (1986). The court notes such testimony simply to advise the district court of a potential issue in this matter.

Deputy Mathis was also called by the government and testified in a manner wholly consistent with the testimony of Deputy Milsaps. He testified that when he was dispatched to the Kilpatrick residence, he was advised that a second subject was outside the home. Upon arriving, he saw that Deputy Milsaps had defendant under control and proceeded to search the grounds for the second subject. He testified that he found Josh Kilpatrick, defendant's brother, down by a creek, and that Josh advised him that his brother had threatened to kill him and had a pistol. Deputy Mathis further testified that Josh Kilpatrick informed him of his brother's name, that he recognized the name, and knew from earlier discussions with other officers that "Tab Kilpatrick" was a convicted felon. Leaving Josh Kilpatrick down by the creek for his own safety, Deputy Mathis returned to Deputy Milsaps' patrol car and asked defendant if he had a weapon on him, which defendant denied. Both officers then asked defendant to place his hands on the vehicle and patted down defendant, finding the pistol.

On cross examination, Deputy Mathis acknowledged that his end of shift report as to this incident was not completely accurate, was done hastily, and was inconsistent (in some parts) with his testimony.

### III. Arguments

At the conclusion of the hearing, defendant argued that the gun should not be admitted into evidence because the deputies did not have a reasonable articulable

suspicion justifying going out to defendant's home to question him, detain him, and pat him down. Further, defendant argues that once Deputy Milsaps failed to see any other person at the home, he should have immediately left the scene as he had no reason to further inquire. He argued that such visit to defendant's home was inappropriate because law enforcement made no effort to first corroborate the 911 calls and amounted to third-hand information.

The government argues that defendant's legal reasoning is flawed because this was a classic "knock and talk," that the emergency calls to 911 fully explain why the officers were there, and that discovery of the weapon on defendant's person was proper after the officers received information that defendant was carrying a pistol and had threatened to kill his brother. The government also argued that the encounter with defendant was a proper stop under applicable decisions of the Court of Appeals for the Fourth Circuit.

## IV. Discussion

### A. Analysis Under Quarles

Determination of whether a stop and subsequent seizure satisfies the requirements of the fourth amendment to the United States Constitution - - in the context of information received through a 911 system - - is guided by the decision of the Court of Appeals for the Fourth Circuit in United States v. Quarles, 330 F.3d

650 (4th Cir. 2003). The appellate court in Quarles first explained a proper investigatory stop or "*Terry* stop," as follows:

> An investigative stop, referred to as a *Terry* stop, is constitutional when it is supported "by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Sprinkle*, 106 F.3d at 617 (citing *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam)). The scope of a *Terry* stop, which is considered an exception to the probable cause requirement, was first established in the 1968 case of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, the Supreme Court noted that the law enforcement official making the stop does not need to be certain that criminal activity is on-going, but needs only to "be able to point to specific and articulable facts which, taken together with rational inference from those facts, reasonably warrant intrusion." *Terry*, 392 U.S. at 21-22, 88 S.Ct. 1868. In defining the reasonable suspicion standard, the Court stated, "The Fourth Amendment requires 'some minimal level of objective justification' for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of evidence." *Alabama v. White*, 496 U.S. 325, 329-30, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (citation omitted). Furthermore, the Court stated that "reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *White*, 496 U.S. at 330, 110 S.Ct. 2412.

Id., at 653(footnote omitted). In United States v. Hensley, 469 U.S. 221 (1985), the Court expounded on *Terry*, explaining that

> if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion.

Id., at 229.

**1. First Inquiry: Reasonable Suspicion Based on Specific and**

**Articulable Facts**

After reviewing *Terry* and its progeny, the Quarles court went on to apply *Terry* and *Hensley* in the context of encounters occasioned by 911 calls:

> The first question in this case is whether the police had reasonable suspicion, based on specific and articulable facts, that the defendant was involved in or connected with a completed felony. *See Hensley*, 469 U.S. at 229, 105 S.Ct. 675. Thus, we must ask if the 911 caller was sufficiently reliable to justify the stop. The defendant argues that because Rainey did not reveal his name until the end of the conversation, the tip was essentially anonymous, and thus more akin to *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). We disagree.

Quarles, at 654. Where the encounter is based on a 911 call, courts must first ask whether the police had a reasonable suspicion that was based on specific and articulable facts, and, as to the facts received via 911, whether there was sufficient indicia of reliability to justify the stop.

While only excerpts of the two 911 calls were played for consideration by witnesses during the hearing, the court has listened to the digital recordings in their entirety inasmuch as they were moved into evidence without redaction or limitation.[5] In this case, the court has listened to the two calls placed by either Ms. Kilpatrick or

---

[5] While defendant did not put on evidence, the government agreed to allow defendant to introduce such evidence and defendant's exhibits were admitted without objection.

Mr. Woods on the day in question in their entirety.[6] Mr. Woods volunteered his name and, when requested, gave the dispatcher both his home address in Macon County as well as advised her of the fact that he was temporarilly residing in Concord for his employment. He further provided his cell phone number. Further, Mr. Wood explained his connection with the defendant (as was done in Quarles) by detailing the complex domestic relationships between the parties. To his credit, Mr. Wood also volunteered that he was a probationer, the name of his probation officer, the fact that his probation officer had advised him to call 911, and the fact that he was presently on the road near Spartanburg, South Carolina. Further, he provided the 911 call center with a plausible reason why he was placing such calls, to wit, that he would be arriving at the house in a couple of hours for child visitation purposes and did not want to get caught up in a "bad situation."

The information received by the 911 call center would lead a reasonable person to believe that the caller was providing reliable information.[7] Clearly, these officers were not acting upon anonymous calls but, as the appellate court in Quarles noted,

---

[6] Ms. Kilpattrick appears to have placed the first call, but was too upset to talk and handed the cell phone to Mr. Woods.

[7] "The amount of information that Rainey was able to provide to the dispatcher enabled the dispatcher to make a determination about his credibility." Quarles, at 656.

calls that could have had consequences for the caller if he gave false information concerning defendant's activities. There certainly is no requirement under Quarles that the caller be personally known to the 911 dispatcher or the deputies, or that the information received be corroborated like information used to make probable cause determinations. Indeed, to require otherwise would completely defeat the purpose of the 911 emergency communications system.

Having received reliable information in the context of a 911 call, the undersigned finds that the deputies had a reasonable suspicion that was based on specific and articulable facts justifying their visit to defendant's home. Having acted upon reliable information, the government has satisfied the first prong of the Quarles analysis.

2. **Second Inquiry: Whether the Stop Exceeded the Scope Permissible Under the Fourth Amendment**

The second inquiry focuses not on the basis for the stop, but on whether the stop exceeded the scope of the fourth amendment.

At the time Deputy Milsaps encountered defendant, he testified that he knew there was a threat involving a firearm. He also testified that when he approached the front door of the Kilpatrick residence, he had reason to believe that someone had just left a rocking chair on the front porch as he approached the home in his police vehicle from the road above. Such indicia of recent departure likely occasioned by the

11

approach of a police vehicle would lead a reasonably prudent officer to believe that something was amiss. Deputy Milsaps testified that when defendant came to the door, he moved the conversation away from the home because he did not know the location of the second individual or the person with the gun might be. Within a few minutes of commencement of the conversation, Deputy Mathis arrived, discovered the hiding place of Josh Kilpatrick, and secured information that the man talking with Deputy Milsaps was the person who had threatened to kill Josh Kilpatrick and was armed. Review of the "Consolidated Report" reveals that between Deputy Milsaps arriving on the scene and the defendant being placed under arrest and transported, only 22 minutes elapsed. See Government Ex. 1, at 2. Further, there was absolutely no evidence that the inquiry became custodial until the officers found the firearm on defendant's person.

Clearly, the brief encounter of at most 22 minutes as well as the consensual interactions between the officers and the defendant was well within the acceptable scope of the fourth amendment. This is especially apparent where the officers were investigating threats to life involving the brandishing of a firearm based on information having indicia of reliability.

### 3. Conclusion

Having considered this encounter under the Quarles framework, the

undersigned respectfully determines that the encounter with defendant and subsequent discovery of the firearm on his person is well within the bounds of the protections afforded defendant under the fourth amendment. For such reasons, the undersigned will respectfully recommend that the district court deny defendant's Motion to Suppress.

B. **Knock-and-Talk Analysis**

The government also argued that the encounter with defendant was justified under the jurisprudence that has developed under the so called "knock-and-talk" exception to the warrant requirement of the fourth amendment.

> We have held that, ordinarily, no Fourth Amendment violation occurs when the police "knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants." *Rogers v. Pendleton*, 249 F.3d 279, 289 (4th Cir.2001); *see Alvarez v. Montgomery County*, 147 F.3d 354, 357 (4th Cir.1998) ("[P]olice may approach a building, including the front entranceway to a residential dwelling, without committing a search where a person lacks a reasonable expectation of privacy in the area."). Furthermore, the police may circle to the back of the home under appropriate circumstances. *See Alvarez*, 147 F.3d at 358. The police may not, however, conduct a full search of the curtilage without a warrant or another justification that would be sufficient for entry into the home itself. *See Rogers*, 249 F.3d at 287, 289.

Edens v. Kennedy, 2004 WL 1737880, 3 (4th Cir. 2004).[8]

Defendant has not argued that the search for Josh Kilpatrick invaded his

---

[8] Due to the limits of Electronic Case Filing, a copy of such unpublished decision is placed in the electronic docket through incorporation of the Westlaw citation.

curtilage; indeed, the evidence presented at the hearing revealed that such search was away from the house and down by a creek, some several hundred feet away from the home, which would be well away from the area traditionally considered curtilage. Defendant has also not argued that Deputy Milsaps' approach to his home to knock on his door somehow violated his fourth amendment privilege because he had enclosed or posted his curtilage.

> [I]f the owner of a home encloses the curtilage with a fence, locks the gate, and posts "No Trespassing" signs, the effect for Fourth Amendment purposes is to extend the walls of the home to the edge of the curtilage. This is because the act of sealing the property creates an elevated expectation of privacy. *Cf. California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) ("The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.' " (*quoting Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring))); *Alvarez*, 147 F.3d at 357 (discussing reasonable expectations of privacy with respect to curtilage).

Id., at 4. In the context of "one's home is one's castle," fencing and posting one's curtilage is the equivalent of placing a moat around the castle, which sends a clear message to strangers that their right to approach ends at the water's edge, extending the expectation of privacy to the enclosed curtilage.

In this case, however, there was absolutely no evidence that defendant's home was gated or posted or that there was any indicia that strangers were forbidden to approach the home and knock on the front door. There is actually no evidence that

the home was the defendant's or he did in fact live there. The only evidence before the court is that Deputy Milsaps approached the home in his patrol vehicle, parked his vehicle in the driveway, and knocked twice on the front door. Mr. Kilpatrick came to the door, Deputy Milsaps told him why he was there, and asked Mr. Kilpatrick to come out in the yard and discuss the matter. Mr. Kilpatrick agreed and discussed the matter with the deputy until such time as a firearm was discovered in his jacket.

There is absolutely no evidence that the encounter was any thing but consensual and it did not turn custodial until defendant was asked to place his hands on the patrol vehicle for purposes of being patted down. By that time, however, Deputy Mathis had reason to believe that defendant could be armed, that he had recently committed a felony against his brother, and that he was a convicted felon not entitled to possess a firearm, another felony. Thus, under a knock-and-talk analysis, it is clear to the undersigned that the knock-and-talk encounter between these deputies and the defendant was well within the bounds of protections afforded by the Fourth Amendment.

### 4. Conclusion

The undersigned has carefully considered the written arguments of counsel, listened to the testimony presented during the evidentiary hearing, considered the oral

arguments of counsel, and closely reviewed each exhibit in its entirety. After conducting a review under both Quarles and the "knock-and-talk" exception to the Fourth Amendment warrant requirement, the undersigned concludes that the encounter with defendant and subsequent discovery of the weapon on defendant's person was well within the protections afforded by the fourth amendment. For the reasons discussed above, the undersigned will recommend that the district court deny defendant's Motion to Suppress.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that defendant's Motion to Suppress (#13) be **DENIED.**

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **ten** (**10**) days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

Signed: August 27, 2009

_____
Dennis L. Howell
United States Magistrate Judge